# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Harry D. Leinenweber | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3846 | **DATE** | 2/18/2004 |
| **CASE TITLE** | Hytel Group, Inc. vs. W.L. Gore & Associates Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 25 Feb. 04 at 9:00 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Gore's motion for summary judgment is granted in part and denied in part.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | FEB 19 2004 | date docketed | | |
| ✓ | Docketing to mail notices. | | | | 29 |
| | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | | |
| WAP | courtroom deputy's initials | | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

FILED

FEB 1 8 2004

JUDGE HARRY D. LEINENWEBER
U.S. DISTRICT COURT JUDGE

HYTEL GROUP, INC.,

                    Plaintiff,

          v.

W.L. GORE & ASSOCIATES, INC.,

                   Defendant.

Case No. 02 C 3846

Hon. Harry D. Leinenweber

DOCKETED

FEB 1 9 2004

## MEMORANDUM OPINION AND ORDER

Plaintiff Hytel Group, Inc. (hereinafter, "Hytel") brings suit against Defendant W.L. Gore & Associates, Inc. (hereinafter, "Gore"). Count I alleges that Gore breached its contract with Hytel by failing to pay for a three-months supply of parts used by Hytel in constructing subassemblies for Gore. Count II, pled in the alternative, makes the same allegations under a promissory estoppel theory. Although not pled in the complaint, Hytel also apparently seeks damages for Gore's failure to pay other costs, such as labor and equipment, associated with Hytel's production of subassemblies. Pursuant to Federal Rule of Civil Procedure 56(c), Gore moves for summary judgment.

## I. INTRODUCTION

### A. The Complaint

Hytel's complaint, never amended, narrowly specifies its allegations against Gore. The complaint states that "this is a case in which plaintiff . . . seeks payment of over $250,000 for

29

parts purchased by plaintiff to manufacture items for defendant pursuant to an agreement that defendant would buy the parts or subassemblies incorporating the parts." In defining damages, the complaint lists "8,666 boards of the RESA [Receiver Electrical Subassembly] and 11,543 TESA [Transmitter Electrical Subassembly], Hytel purchased for Gore pursuant to the August 23, 2001 Forecast." As such, Hytel's complaint never alleges damages stemming from lost profits and assorted costs (*i.e.*, overhead, labor and equipment) under either a breach of contract or a promissory estoppel theory. Indeed, Hytel's complaint does not even include the near-universal prayer for other relief that the Court deems appropriate.

Nevertheless, beginning with Hytel's interrogatory answers and continuing through deposition and motion practice, Hytel has consistently argued that it suffered those damages. In doing so, Hytel gave Gore notice of its intent to seek recovery for damages beyond the allegedly unpaid-for parts. As Gore has not argued that Hytel's complaint pleads itself out of this extra relief, the Court finds that Hytel's complaint has been constructively amended to include any additional claims for damages made by Hytel during the course of discovery.

## B. Local Rule 56.1 Responses

Local Rule 56.1 of the United States District Court for the Northern District of Illinois ("Local Rule 56.1") establishes procedures that both moving and opposing parties must follow in filing and responding to a motion for summary judgment. Under

Local Rule 56.1, the moving party must submit a statement of material facts with "references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 56.1(a)(3). In turn, the opposing party must file "a response to each numbered paragraph in the moving party's statement," and, in the case of disagreement, provide specific references to supporting evidentiary material. Local Rule 56.1(b)(3)(A). If the opposing party does not respond and controvert the moving party's statement of material facts, those facts are deemed admitted for the purposes of the motion. Local Rule 56.1(b)(3)(B); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

In this case, Gore's paragraph 8 of its Local Rule 56.1 statement states that:

> Gore was under no obligation to issue forecasts. Gore was also under no obligation to purchase finished boards at any time. Gore's obligation was limited to paying Hytel for material and supplies Hytel purchased in reliance on Gore's three-month forecasts. Anything Hytel did beyond that insofar as ordering parts for subassemblies was concerned was at Hytel's sole risk (internal citations omitted).

Hytel's response to paragraph eight states that it "disputes the allegations contained in paragraph 8." However, Hytel does not specifically refute with "specific references to supporting evidentiary material" that "Gore was also under no obligation to purchase finished boards at any time." Consequently, the Court deems this portion of paragraph eight admitted.

Similarly, Hytel's responds to Gore's paragraph 22 by stating "Hytel does not dispute the facts set forth in paragraph 22." Therefore, the Court admits Gore's paragraph twenty-two statement that "profit was built into the purchase price for finished goods."

## C. Factual Background

Between 2000 and 2002, Gore engaged in the manufacture and sale of fiber optic connectors comprising, in part, a RESA and a TESA. In early 2000, Gore selected Hytel as its supplier of these subassemblies. In pitching the deal to Hytel, Gore representatives indicated that Gore's demand for subassemblies would resemble a hockey stick. By this, Gore meant that demand would start out low but rapidly shoot upward. Because Hytel required a large lead-time to manufacture subassemblies (a process that necessitated securing the necessary parts, labor and equipment), Gore agreed to provide Hytel with six-month forecasts of its expected demand.

Although Gore never promised to purchase specific quantities of subassemblies, it admits agreeing to reimburse Hytel for up to a three-month supply of parts, if Hytel bought in reliance on Gore's demand forecasts and the forecasts exceeded the actual demand. Gore claims its agreement with Hytel was a written contract memorialized in a series of February 15, 2001 e-mails between Gore and Hytel officers. Under this agreement, Gore acknowledges it owes Hytel for 505 RESA parts and 2,900 TESA parts. However, Gore claims that its contract obligations are limited only to paying for these parts, and denies ever agreeing to pay for

other costs such as overhead and labor. Similarly, Gore denies ever making Hytel any unambiguous promises concerning future orders. As such, Gore contends that any money Hytel expended beyond the three-month parts supply was at Hytel's own risk – and not in obligation of any contract or in reliance upon any promise.

Conversely, Hytel denies that the February 15, 2001 e-mails accurately describe the contract in its entirety, and alleges that a preceding oral agreement with Gore entitles it to more than just payment for a three-month supply of parts. In addition to parts, Hytel contends that Gore orally agreed to pay costs such as labor and overhead expended in reliance on Gore's forecast. Although Hytel concedes that the contract called for it to factor profit into the purchase price for the finished boards, Hytel also asks the Court to award lost profits damages.

Additionally, Hytel challenges the methodology Gore uses to calculate its parts-cost liability. By Hytel's reckoning, the contract required it to purchase parts beyond the three-month forecast, to ensure a constant one-month "safety stock" was always available to Gore. Hytel also spars with Gore regarding whether "backlog" should be factored into Gore's parts-debt to it. The result is that, in their interrogatory answers, Hytel claims contract damages of $480,962.40. This includes $183,347.28 worth of lost profits, $258,856.12 in material costs, $14,520 in labor costs, and $24,239 in incidental damages such as unemployment taxes paid as a result of breach-induced layoffs.

Lastly, Hytel claims that Gore made numerous unambiguous promises regarding the size and value of future orders. In reliance, Hytel contends that it expended $483,646.03 purchasing new equipment, and $125,000.00 in unbilled engineering services that it expected to recoup over through sales of completed subassemblies. Accordingly, Hytel also seeks $606,646.00 in reliance damages.

## II. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A fact is "material" if it could affect the outcome of the suit under the governing law; a dispute is "genuine" where the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The burden is initially upon the movant to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). In assessing the movant's claim, the court must view all the evidence and any reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmovant. *Miller v. Am. Family Mut. Ins. Co.,* 203 F.3d 997, 1003 (7th Cir. 2000). Once the moving party has met

its burden, the nonmoving party "may not rest upon the mere allegations" contained in its pleading, but rather "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990); *Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 620 (7th Cir. 1989). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Accordingly, summary judgment is mandatory "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In such a situation, there can be " 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323.

## B. Count I: Breach of Contract

### 1. Contract Standards

In settling contract disputes, a federal court should look to the state law that governed the formation of the contract. *Gibson v. Neighborhood Health Clinics, Inc.*, 121 F.3d 1126, 1130 (7th Cir. 1997). In this action, the Court presumes that the law of Illinois applies, since this case was filed in Illinois, Hytel is an

Illinois corporation, and Gore's reply memorandum refers to Illinois as the appropriate sovereign.

Under Illinois law, a plaintiff seeking relief for breach of an oral contract bears the burden to both plead and prove the essential terms of the agreement sued on; that is, the offer made and its acceptance. *Richco Plastic Co. v. IMS Co.*, 288 Ill. App. 3d 782,786 (App. Div. 1997). As with any contract, the offer "must be so definite as to its material terms or require such definite terms in the acceptance that the promises and performances to be rendered are reasonably certain." *Rose v. Mavrakis*, 278 Ill. Dec. 751,755 (App. Div. 2003).

## 2. *Written or Oral Contract?*

Gore contends that it had a written contract with Hytel, requiring it to purchase up to three months' worth of parts should its purchase orders fall below the midpoint forecasts it issued to Hytel. Gore contends this contract was formalized in its entirety in a series of February 15, 2001 e-mails. In these e-mails, Gore officer Christopher Dohl ("Dohl") cautioned Hytel that he believed Hytel was ordering too many raw boards, and reminded Hytel that "Gore agrees to purchase any boards brought to forecast for 2 months. This was agreed upon at our meeting on 9/27." Hytel officer Kevin Ledvina responded by stating that he recalled Hytel President Dirk McCoy ("McCoy") insisting upon a minimum of three months' protection. Dohl then answered with a warning that Hytel was still ordering to the maximum forecast, not the agreed upon

- 8 -

midpoint forecast. McCoy then replied to Dohl, writing that "Gore's direction was very clear - order to the midpoint of the forecast, consistent with our lead times. If we order beyond that, we are doing so at our sole risk." Dohl sent the final e-mail, remarking that McCoy's position "Sounds good, Thanks for the clarity, and insured confidence of continual board supply."

Hytel argues that these e-mails do not memorialize the entire agreement, but merely clarify an apparent ambiguity in the previously-made contract. Hytel notes that the e-mails do not preclude, or even discuss, the possibility that Gore also bore responsibility for overhead and labor costs. Indeed, Hytel points out that the e-mails themselves refer specifically only to raw boards, not even other parts and raw materials to which Gore fully concedes it owes payment.

On this point, Hytel is correct. The e-mails do not contain a formal offer or an acceptance, and therefore cannot function as a contract. Indeed, the e-mails themselves refer to a September 27 (presumably referring to September 27, 2000) agreement, implying that the parties formed a contract on that date. In addition, the e-mails discuss only Gore's liability for boards, omitting any discussion of other parts and raw materials to which Gore fully concedes liability. Thus, it is clear that the e-mails intend merely to clarify one particular aspect of the previously agreed-upon contract.

That being said, the only evidence Hytel presents of *any* agreement comes via deposition testimony of McCoy and Hytel Chief Executive Officer Scott Johansen ("Johansen"), who both testify that the agreement arose in oral discussions with Gore officials. Thus, for purposes of summary judgment, the Court will assume that the purported contract existed in oral form prior to the February 15, 2001 e-mails. This means that while the Court acknowledges that the e-mails provide evidence of certain aspects of the Hytel-Gore contract, it does not hold that the e-mails record the entire contract.

### 3. Lost Profits

In paragraph eight of its Local Rule 56.1 Statement, Gore contends that "Gore was also under no obligation to purchase finished boards at any time." In paragraph twenty-two, Gore states that "profit was built into the purchase price for finished goods." As Hytel failed to dispute to either statement, the Court deems both admitted. This means that, for purposes of this motion, the contract stipulated that Hytel factored profit into the purchase price for the finished boards, which Gore had no obligation to purchase. It therefore follows that the contract gave Hytel had no legal expectation of profit. Accordingly, Gore meets its initial summary judgment burden on the issue of lost profits.

Hytel responds by arguing that "there is a substantial amount of evidence . . . that indicates Hytel understood that Gore would be liable for all costs (including profit) associated with its

- 10 -

forecasts and safety stock." However, Hytel cites no evidence or
deposition testimony supporting this position. Hytel also asks the
Court to grant it lost profits by reading in § 2-708(2) of the
Uniform Commercial Code into the contract. This provision is
designed to place "the seller in as good a position as performance
would have done," providing him with lost profits and incidental
damages. The difficulty with Hytel's use of § 2-708(2) is the fact
that, as shown above, Hytel had no legal right to profit – and
therefore the UCC cannot convey such a right. The UCC imputes
terms only when the contract is silent or there has been no meeting
of the minds on the disputed issue, such as in a classic "battle of
the forms." It does not rewrite existing contracts with legally
definite terms.

The Court finds that Gore meets its initial summary judgment
burden on the issue of lost profits, and that Hytel fails to meet
its responsive burden. The Court thus grants summary judgment to
Gore on the Count I issue of lost profits.

### 4. Labor and Incidental Costs

Gore also contests Hytel's prayer for repayment of labor and
incidental costs, claiming that its agreement with Hytel excluded
them. However, Gore substantiates its position with only out-of-
context and misleading citations to the record. For instance, Gore
supports its claim that the contract shields it from responsibility
for labor and incidental costs by referring to the February 15,
2001 McCoy's e-mail, which states "if [Hytel] order[s] beyond [the

three-month lead time], we are doing so at our sole risk." On its face, the e-mail limits simply Gore's liability for parts to three-months. It does not address the question of who bears the risk for labor and incidental costs. Similarly, Gore's use of selective quotes from McCoy's and Johansen's deposition testimony also fails to support its argument. When read in context, both these depositions factually dispute Gore's claim of no liability for labor and incidental costs. As the movant in this summary judgment proceeding, Gore bears the burden of initially establishing the absence of material facts. On this issue, Gore has failed to do so. Therefore, Gore has failed to shift the burden to Hytel, and the Court cannot dispose of this issue through summary judgment.

### 5. Equipment and Engineering

Although Hytel also seeks damages for the purchase of equipment, McCoy admitted in deposition that Gore "did not agree to give [Hytel] cash up front" for the equipment. Rather, Hytel claims that equipment costs "factored into our price" for finished product. Additionally, McCoy noted that Hytel agreed to buy the equipment only because "Chris Dohl said, 'You have to buy this equipment because out ramp-up is coming, the volume is looking huge." Similarly, Hytel does not allege that the contract required Gore to finance engineering costs. Based on the presented evidence, Hytel makes only a promissory estoppel claim for equipment and engineering costs – and not a breach of contract

claim. Therefore, the Court addresses these issues solely under Count II's promissory estoppel framework.

### *6. Safety Stock*

Hytel contends that, in addition to the three months worth of materials, labor, and incidental costs, Gore also agreed to pay for one month's worth of "safety stock." Gore disputes this, insisting that its liability is limited to three months' worth of materials – and that its requests for "safety stock" were factored into higher initial purchase orders.

Though, as the Court earlier found, the February 15, 2001 e-mail exchange does not memorialize the entire agreement, it does seem to preclude Hytel's claims regarding the safety stock. As noted above, McCoy admitted in the e-mail that "If we order beyond our lead times, we are doing so at our sole risk. . . . Our total lead time is 12 weeks." McCoy thereby implicitly recognized that Gore bore no liability for safety stock materials – as anything Hytel did beyond twelve weeks fell "at our sole risk." Additionally, a July 18, 2001 Dohl e-mail to Hytel stated that "we would like to hold 1 month of safety stock *in house* as well as the demand that you see on the attachment" (emphasis added). By informing Hytel that Gore would hold the safety stock "in house," this Dohl e-mail confirms Gore's contention that the safety stock discussions related to Gore initially placing more purchase orders rather than Hytel maintaining a perpetual excess supply of raw material.

Hytel attempts to refute this evidence by references to its executives' deposition testimony, where Johansen and McCoy parrot Hytel's interpretation of safety stock. In doing so, Hytel essentially argues that the one-month safety stock agreement formed a portion of the oral agreement it made with Gore. Since Gore has met its initial summary judgment burden of showing no issue of material fact, Hytel must rebut by showing "specific facts" evidencing this oral agreement. This it fails to do. Hytel points to no specific conversations in which it claims Gore promised to pay for safety stock in addition to the three-months parts supply. Nor does Hytel give a specific recitation of Gore's alleged offer to pay for safety stock in this manner. Hytel certainly presents nothing to refute the clear written evidence found in the e-mails. Accordingly, Hytel cannot withstand summary judgment on this issue.

### 7. *Damage Calculation*

Although agreeing in principle on Gore's liability for three-months of materials, Hytel and Gore spar over the damages resulting from that liability. One of their disputes, settled above in Gore's favor, concerns whether Gore bears additional responsibility for safety stock. However, the resolution of the safety stock question does not end the parties' bickering over the materials and parts damage calculation. Rather, the parties also dispute the issue of "backlog."

The backlog disagreement concerns subassemblies that Hytel contends Gore ordered before the August 23, 2001 forecast and that

Hytel had already manufactured, but not shipped to Gore. Hytel argues that the August 23, 2001 forecast concerns only subassemblies not *yet* ordered by Gore. Gore responds by stating that the August 23, 2001 forecast was all-inclusive of its requirements – and included subassemblies it had ordered but not received prior to that date. In the Court's view, this is a clear factual dispute inappropriate for summary judgment.

## C. Count II: Promissory Estoppel

### 1. *Promissory Estoppel Standards*

Under Illinois Law, a party may plead both plead breach of contract and promissory estoppel in the alternative, as Hytel does here. *Czerska v. United Airlines, Inc.*, 292 F. Supp. 2d 1102 (N.D.Ill. 2003). However, a fact-finder's determination that the parties agreed to an enforceable contract precludes recovery under promissory estoppel. *Id.* This occurs only when "the performance which is said to satisfy the requirement of detrimental reliance is the same performance which supplies consideration for the contract." *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505,512 (App. Div. 1995). However, should a contract's terms be ambiguous or unknown "the absence of fully detailed terms would . . . discourage dismissing the promissory estoppel claims." *Tibor Machine Products, Inc. v. Freudenberg-NOK General Partnership*, 942 F. Supp. 1165, 1174 (N.D. Ill. 1996), *partially vac'd on other grounds* 967 F. Supp. 1006 (N.D. Ill. 1997). Here,

Hytel's contract with Gore clearly imposed liability on Gore for the costs of three months' worth of materials, and clearly absolved Gore of responsibility for covering lost profits and safety stock. Therefore, the Count I breach of contract claim covers each of these issues, preventing their resolution via the Count II promissary estoppel claim. Likewise, should a jury determine that Hytel's contract with Gore either covers or excludes labor, incidental, equipment and engineering costs, such a finding would bar a promissary estoppel claim on those issues. However, as a jury could determine that the contract did not assign liability for these costs, the Court discusses below whether the promissory estoppel claims for each cost, in turn, can withstand summary judgment.

To establish a promissory estoppel claim on these issues, Hytel must show that: 1) the defendant made an unambiguous promise to the plaintiff; 2) the plaintiff relied on the promise; 3) the plaintiff's reliance was expected and foreseeable by the defendant; and 4) the plaintiff relied on the promise to her detriment. *Pokora v. Warehouse Direct, Inc.*, 322 Ill. App. 3d 870, 879 (App. Div. 2001).

### 2. Labor and Incidental Costs

As discussed earlier, Gore fails to establish any material facts disputing the proposition that it promised to pay for labor and incidental costs. Instead, it relies only on out-of-context quotes from the February 15, 2001 e-mails and from McCoy's and

- 16 -

Johansen's depositions that – when read in context – show no denial of such a promise. Consequently, Gore fails to meet its minimum summary judgment burden of showing that no material facts are in dispute. As such, to the extent that Hytel *makes* a promissory estoppel claim for labor and incidental costs (its brief states "there is sufficient evidence in the record to establish a claim for promissory estoppel based upon the same allegations made in Count I," but never explicitly lays out a promissory estoppel-based labor and incidental cost claim), this claim withstands summary judgment.

### 3. Equipment Costs

Gore contests Hytel's promissory estoppel claim for equipment and engineering costs on several grounds. First, Gore again argues that the February 15, 2001 e-mails constitute a valid written contract limiting its liability to just three-months worth of materials cost. Because the Court rejects this position, Gore's argument here fails.

Gore also contends that any alleged promises made to Hytel cannot withstand the tests of unambiguity and reliance. Gore argues that its only quasi-promise to Hytel consisted of talking about the "hockey stick"-shaped demand. Gore also states that its hockey stick-comparison occurred before it even selected Hytel as its supplier – and therefore, prior to it having any obligations to Hytel whatsoever. Thus, in Gore's view, even if the Court finds

that its "hockey stick" comparisons qualify as an unambiguous promise, Hytel could not have reasonably relied on it.

Gore also argues that other factors compel a finding of no reliance. Gore notes that Hytel purchased most of the equipment prior to being selected as Gore's supplier of subassemblies. Ergo, Gore contends that Hytel bought the equipment not out of reliance on any Gore promise, but rather to entice Gore to select it instead of a competitor for the subassembly contract. Furthermore, Gore insists that Hytel could use most of the equipment for purposes beyond its contract with Gore.

Hytel disputes Gore's version of the facts concerning both ambiguity and reliance. First, Hytel contends that Gore's promises to it were more specific than references to "hockey stick" shaped demand. Hytel notes – and Gore fails to dispute – that the phrase "hockey stick" meant that demand would start out slow but then sharply accelerate. Hytel claims that Gore promised hockey stick-demand both before and repeatedly it became Gore's supplier. Hytel also claims that Dohl specifically told McCoy "you have to buy this equipment because our ramp-up is coming, the volume is looking huge. . . . I guarantee [Hytel] will need this equipment." In Hytel's view, it purchased this equipment "based on the lots and lots of parts they said they were going to buy," then found itself stuck with useless equipment when Gore stopped ordering subassemblies.

As to the issue of reliance, Hytel acknowledges most of Gore's allegations, but contends that it purchased at least one "Finetech" machine subsequent to commencing its relationship with Gore, and in response to Gore's alleged promises. Additionally, although Hytel admits that although most of the equipment theoretically *could* serve other purposes, in reality it has been *unable* to either use or sell them.

For purposes of this motion, the Court must accept Hytel's factual allegations as true. Thus, it finds questions of fact that preclude a granting of full summary judgment. This includes promises such as "I guarantee [Hytel] will need this equipment" that clearly qualify as unambiguous. Similarly, Hytel shows reliance via its submitted deposition testimony that it purchased the equipment because of (and therefore in reliance upon) Gore's unambiguous promises, and has been unable to use it since Gore terminated their business relationship. However, Gore's motion for summary judgment is granted with respect to equipment Hytel purchased prior to its selection as Gore's supplier and prior to Gore's granting of the alleged promises.

Gore's briefs do not directly contest either the reasonableness or damages prongs of the promissory estoppel test. This allows Hytel to establish both without contest - showing reasonableness by referring to Gore's promises and forecasts of expected demand, and damages by the price of the equipment. Even had Gore contested reasonableness, recent Seventh Court precedent

suggests they would still lose. *See Cloud Corporation v. Hasbro, Inc.*, 314 F.3d 289 (7th Cir. 2002)(in a contract modification case, decision of supplier to produce parts for manufacturer in absence of purchase orders was reasonable).

### *4. Engineering Costs*

The same analysis applies as to engineering costs, an issue not extensively briefed by either party. To the degree that Hytel expended resources on engineering to improve its chances of securing the supplier contract with Gore, it clearly did not act reliance on any promise. However, engineering costs that post date the Hytel-Gore agreement, and the alleged promises concerning future orders, may factually have been made in reasonable reliance on such promises. These costs withstand summary judgment and should proceed to trial.

### III.  **CONCLUSION**

For the reasons discussed above, Gore's motion is granted in part and denied in part, as follows:

1.   On Count I, the Court grants summary judgment for Gore on Hytel's claims for lost profits and safety stock, and concludes that Hytel does not make a breach of contract claim for equipment and engineering costs.

2.   The Court denies summary judgment as to Hytel's other Count I claims.

3.    On Count II, the Court grants summary judgment for Gore with respect to Hytel's claims for parts, lost profits and safety stock.

4.    The Court denies summary judgment as to Hytel's Count II claims for labor, incidental, equipment, and engineering costs.

**IT IS SO ORDERED.**

Harry D. Leinenweber, Judge
United States District Court

Date: _February 18, 2004_